UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

In re:

                                                        Chapter 11 Case

QUALITY FRESCA I, LLC,[1]                                Case No. 26-_____

            Debtor.

_____/

**DECLARATION OF G. MICHAEL VERDISCO IN SUPPORT OF DEBTOR'S
CHAPTER 11 PETITION AND FIRST DAY PLEADINGS**

I, G. Michael Verdisco, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.      I am the Chief Restructuring Officer (the "CRO") of Quality Fresca I, LLC (the "Debtor" or the "Company"), having been appointed on July 9, 2026. I continue to serve as CRO for the Debtor, as debtor and debtor-in-possession, in the above-captioned chapter 11 case (the "Chapter 11 Case"). As CRO, I report to Joseph J. Luzinski, the Debtor's independent manager.

2.      I am a Managing Director with Gulf Atlantic Capital Corporation ("GACC"). Founded in 1995, GACC is a financial advisory firm that, for approximately 30 years, has focused on working with distressed middle-market companies, lenders, and investors across a mix of industries. GACC's services include financial and operational restructuring, lender and creditor negotiations and forbearance agreements, debt restructuring and recapitalization, enterprise valuation, and chapter 11 services, as well as serving in interim crisis management roles such as chief restructuring officer and chief financial officer. GACC also has extensive restaurant-industry

---

[1]  The address of the Debtor is 375 South County Road, Suite 210, Palm Beach, FL 33480.  The last four digits of the Debtor's federal tax identification number are 1053.

experience, serving as financial advisor to lenders and operators in multi-unit restructurings. GACC's office is located at 2701 North Rocky Point Drive, Suite 630, Tampa, FL 33607.

3.       As a Managing Director with GACC, I have advised companies across a variety of industries and have served in various roles in numerous restructurings and bankruptcies. I have over 30 years of experience providing financial advisory and operational restructuring services to distressed middle-market companies, having worked on behalf of borrowers, lenders, and investors in more than 250 engagements involving distressed situations. My expertise includes business model and operational viability analysis, crisis working capital and cash management, loan restructuring and forbearance negotiations, debt and equity recapitalization, enterprise valuation, and the implementation of exit strategies, including section 363 going-concern sales and orderly wind-downs, with particular experience advising multi-unit restaurant franchisees.

4.       My restaurant industry experience spans more than 25 engagements on behalf of both lenders and borrowers. Most recently, I served as financial advisor to World of Beer, a 46-unit casual dining restaurant concept, in the chapter 11 case styled *In re: WOB Holdings LLC*, Case No. 24-04538-CPM (Bankr. M.D. Fla. 2024), where I negotiated the terms of debtor-in-possession financing, developed the related budgets, and developed and implemented a successful new-value plan of reorganization that was confirmed by the court.

5.       On the date hereof (the "Petition Date"), the Debtor commenced a voluntary case under chapter 11 of title 11 of the United States Code (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Florida (the "Court"). The Debtor is operating its business and managing its affairs as a debtor-in-possession. To date, no creditors' committee has been appointed in the Chapter 11 Case by the Office of the United States Trustee for the Southern District of Florida (the "United States Trustee"). No trustee or examiner has been

appointed in the Chapter 11 Case. The principal purpose of this Chapter 11 Case is for the Debtor to maximize the value of its business for the benefit of all stakeholders, whether through a reorganization that restores the enterprise to sustainable profitability or through a value-maximizing sale process.

6.      To minimize any adverse effects on its estate as a result of the commencement of this Chapter 11 Case, the Debtor has filed certain motions, applications and other papers seeking various types of "first day" relief (including all attachments and exhibits, amendments and proposed orders thereto, collectively, the "First Day Filings").[2] The First Day Filings seek relief aimed, among other things, to establish the foundation for the smooth and efficient entry into chapter 11 and the administration of this Chapter 11 Case. Gaining and maintaining the support of the Debtor's employees, vendors, customers, and other key constituents, as well as maintaining the day-to-day operations of the Debtor's business with minimal disruption, will be critical to the Debtor's efforts in chapter 11 and its ability to preserve and maximize the value of its estate. The relief requested in the First Filings is in the best interests of the Debtor, its estate, and its creditors, and is necessary to avoid immediate and irreparable harm.

7.      I submit this declaration ("Declaration") to assist the Court and other parties-in-interest in understanding the Debtor, its business, and the Chapter 11 Case, as well as to support the Debtor's petition and the First Day Filings. Except as otherwise indicated, I have personal knowledge of the matters set forth in this Declaration, and all statements and facts set forth herein are based upon my personal knowledge, discussions with the Debtor's senior management and the Debtor's professionals, including my colleagues at GACC, my and our team's review of the Debtor's books and records, relevant documents and other information prepared or collected by

---

[2] Capitalized terms used by not otherwise defined herein shall have the meanings ascribed to them in the relevant First Day Filing(s).

the Debtor's professionals, or my opinion based upon my experience, knowledge, and information regarding the Debtor's operations and financial condition. In making my statements based upon my review of the Debtor's books and records, relevant documents and other information prepared or collected by the Debtor's professionals and representatives, I have relied upon those professionals and representatives accurately recording, preparing or collecting such documentation and other information.

8. I am authorized to submit this Declaration on behalf of the Debtor. I am over the age of eighteen, and if called to testify as a witness in this matter, I could and would competently testify to each of the statements and facts set forth herein.

9. This Declaration is divided into three parts. **Part I** provides background information about the Debtor, including its past and current business operations, its corporate and capital structure, and the circumstances leading up to the filing of this Chapter 11 Case. **Part II** summarizes the Debtor's primary objectives in this Chapter 11 Case. **Part III** lists, among other things, the primary First Day Filings and incorporates herein by reference the facts set forth sets forth in such First Day Filings to create the evidentiary basis for the relief sought in each of the First Day Filings.

**PART I**
**BACKGROUND**

**I. OVERVIEW OF THE DEBTOR'S BUSINESS OPERATIONS.**

    **a. The Debtor's Restaurants**

10. Founded in 2000 and based in Atlanta, Georgia, Moe's Southwest Grill® is a fast casual restaurant franchise known for serving fresh, made-to-order Southwestern and Tex-Mex food.

11. On or about March 9, 2020, the Debtor acquired 67 franchised Moe's Southwest

4

Grill® locations in Florida, South Carolina, Virginia, Maryland, and the District of Columbia. The Debtor's goal was simple: to own and operate a best-in-class Moe's Southwest Grill® franchise group and to bring the Moe's Southwest Grill® experience to communities across the Southeast.

12.     In August 2021, the Debtor acquired two additional Moe's Southwest Grill® restaurants in Florida, bringing the Debtor's total to 69 restaurants.

13.     As of the Petition Date, the Debtor operates its Moe's Southwest Grill® restaurants out of 38 locations (each, a "Restaurant", and collectively, the "Restaurants") in attractive markets located in Florida, South Carolina, Virginia, and Washington D.C., making it one of the largest franchisees in the country. The Restaurants are informally organized into six geographical groups, including (i) District of Columbia/Maryland/Virginia (DMV) (7 Restaurants), (ii) Ft. Meyers/Naples (6 Restaurants), (iii) Tallahassee (3 Restaurants), (iv) Jacksonville/Gainesville (11 Restaurants), (v) Tampa (4 Restaurants), and (vi) Charleston (7 Restaurants).

### b. Franchise Agreements and Leases

14.     Each of the Restaurants is subject to its own *Moe's Southwest Grill Franchise Agreement*, by and between Moe's Franchisor SPV LLC, an affiliate of GoTo Foods ("Franchisor"), and the Debtor (each, a "Franchise Agreement", and collectively, the "Franchise Agreements"). Each Franchise Agreement grants the Debtor a non-exclusive license to operate a specific Restaurant using the Moe's Southwest Grill® trademarks, service marks, and system, and provides for certain discretionary operational support from Franchisor, in exchange for payment of certain royalties and advertising contributions to Franchisor in accordance with and subject to the terms and conditions of the Franchise Agreements. An indirect parent of the Debtor provided guarantees of certain of the Debtor's obligations under the Franchise Agreements.

15.     Each of the Restaurants is also subject to its own lease agreement (each, a "Lease Agreement" and collectively, the "Lease Agreements") by and between the Debtor and the lessor of the property on which the Restaurant is located.

### c.  Debtor's Employees

16.     As of the Petition Date, the Debtor has approximately 603 employees (each, an "Employee," and collectively, the "Employees"), of whom 49 are on salary (the "Salaried Employees" or "Full Time Employees") and, 554 of whom are paid hourly (the "Hourly Employees" or "Part Time Employees"). The Debtor's employee workforce is comprised of 589 restaurant-level Employees, who perform functions necessary to prepare and serve food, receive stock and inventory, and handle daily upkeep of each restaurant location. An additional 14 Employees are District Managers, Directors of Operations, Vice President of Operations, and Catering sales managers and specialists.

## II.    CORPORATE ORGANIZATION

17.     The Debtor is a limited liability company formed under the laws of the State of Delaware. Non-debtor, Quality Fresca I Holdings, LLC ("Holdings") is a manager and sole member of the Debtor. Joseph J. Luzinski serves as the Debtor's independent manager.

## III.   DEBTOR'S PREPETITION CAPITAL STRUCTURE AND FINANCIAL CONDITION

### a.  Prepetition Secured Debt

18.     On or about March 9, 2020, in connection with its initial acquisition of the 67 Restaurants, the Debtor, as borrower, and Holdings, as guarantor, entered into that certain Credit Agreement (as amended, restated, supplemented, or otherwise modified from time to time, the "Credit Agreement") with BBVA USA as Administrative Agent and Lender. The Credit Agreement, as originally executed, provided for the following credit facilities:

a.  Term Loan with an original commitment of $32,500,000;

b.  Development Line of Credit ("DLOC") with a commitment of $4,000,000; and

c.  Revolving Line of Credit ("RLOC") with a commitment of $500,000.

19.  In June 2021, PNC Bank, National Association ("PNC") became the successor to BBVA USA as Administrative Agent and Lender under the Credit Agreement.

20.  The Credit Agreement has been amended eleven (11) times, most recently pursuant to that certain Eleventh Amendment to Credit Agreement dated March 26, 2026 (the "Eleventh Amendment"), which, among other things, extended the Final Maturity Date to April 30, 2026.

21.  The obligations under the Credit Agreement are secured by a first-priority lien on substantially all of the Debtor's assets pursuant to that certain Guaranty and Security Agreement dated March 9, 2020 (the "First Security Agreement") by and among the Debtor, Holdings, and PNC.

22.  On or about May 5, 2026, PNC sold and assigned the Credit Agreement and the First Security Agreement, and its rights therein, to GR Loanco 1 LLC (the "Prepetition Lender"), an affiliate of the Debtor's ultimate parent.

23.  After its acquisition of the Credit Agreement and the First Security Agreement, the Prepetition Lender made a second loan to the Debtor in the principal amount of $700,000, as evidenced by that certain Promissory Note dated as of July 23, 2026 and effective as of May 6, 2026 (the "Second Note"). The Second Note is secured by a second-priority lien on substantially all of the Debtor's assets, granted to the Prepetition Lender pursuant to that certain Security Agreement effective as of May 6, 2026 (the "Second Security Agreement," and together with the Second Note, the "Second Loan").

7

24. On or about July 30, 2026, the Prepetition Lender made a third loan to the Debtor in the principal amount of $100,000, as evidenced by that certain Promissory Note dated as of July 30, 2026 (the "Third Note"). The Third Note is secured by a third-priority lien on substantially all of the Debtor's assets, granted to the Prepetition Lender pursuant to that certain Security Agreement dated as of July 30, 2026 (the "Third Security Agreement" and together with the Third Note, the "Third Loan").

25. The First Security Agreement, the Second Security Agreement, and the Third Security Agreement are referred to collectively as the "Security Agreements." The Credit Agreement, the Second Note, the Third Note, the Security Agreements, and all related loan and security documents or instruments executed in connection therewith are referred to collectively as the "Prepetition Loan Documents." Pursuant to the Security Agreements, the Debtor granted to the Prepetition Lender liens (collectively, the "Prepetition Liens") on substantially all of the Debtor's assets, including Cash Collateral (as defined herein) (collectively, the "Prepetition Collateral").

26. As of the Petition Date, approximately $15,200,000 in aggregate principal remained outstanding under the Credit Agreement, plus accrued and unpaid interest, fees, costs, and other charges; approximately $700,000 remained outstanding under the Second Loan; and approximately $100,000 remained outstanding under the Third Loan (collectively, together with all accrued and unpaid interest, fees, and expenses, the "Prepetition Secured Obligations").

b. **General Unsecured Trade Payables**

27. In the ordinary course, the Debtor incurs trade debt with certain landlords, vendors, suppliers, and taxing authorities in connection with the operation of its business. As of the Petition Date, the Debtor's outstanding trade payables totaled approximately $2,100,000 in the aggregate.

8

c. **<u>Recent Financials</u>**

28. For the fiscal year ending 2025, the Debtor had net sales of $58,941,831 and total negative consolidated EBITDA of $111,204.

29. As of December 31, 2025, the Debtor's balance sheet reflected assets of approximately $44 million and liabilities of approximately $52 million.

30. The Debtor's total year-to-date revenue and EBITDA through June 15, 2026 (P6) are $26,382,413 and $315,254, respectively.

31. The Debtor's total year-to-date store-level EBITDA through P6 is $1,149,360.

## IV. EVENTS LEADING TO THE FILING OF THE CHAPTER 11 CASE

32. The Debtor has faced significant hurdles resulting from industry headwinds, increased costs, and declining revenue, which have challenged the Debtor's business and depleted its liquidity. Over the past several years, and particularly following the COVID-19 pandemic, the Debtor's business suffered significantly from loss of foot traffic, resulting in declining revenue without proportionate decreases in rental obligations, debt service, and other liabilities. Additionally, recent increases in costs of shipping and food, decreased availability of labor, and inflation generally have exacerbated the Debtor's cash flow issues. As a result, although several of the Restaurants have remained profitable, others have been operating at a loss, resulting in the Debtor's inability to meet its obligations and achieve the financial metrics required under various agreements.

33. Following the pandemic, the Debtor's business partially recovered, but in 2025, ongoing inflation, increased costs, and competitive pressures that reduced customer traffic caused the Company's EBITDA to decline.

34. From May 2021 through December 2025, the Company negotiated a series of amendments to the Credit Agreement, as further described in Section C(a) above, that reduced the

outstanding loan balance. During the same period, the Company closed 19 underperforming stores—reducing its total to 50 as of December 31, 2025. The Debtor has since closed 12 additional underperforming stores.

35.     On August 5, 2025, Franchisor notified the Debtor that it was in default under all of the Franchise Agreements.

36.     On or about September 4, 2025, Franchisor and the Debtor entered into that certain Multi-Unit Addendum No. 1 (the "Multi-Unit Addendum No. 1") whereby Franchisor agreed to defer certain outstanding and ongoing amounts due to Franchisor or its affiliates in order to provide the Debtor with additional time to pay to Franchisor such amounts and to support the Debtor's continued operation of the Restaurants.

37.     The Debtor complied with its obligations under Multi-Unit Addendum No. 1, which has since expired on its own terms.

38.     Given the Debtor's negative 2025 results and continued decline into early 2026, the Debtor's management began negotiations with PNC and GoTo Foods in the first quarter of 2026 to address, among other things, the Debtor's strained liquidity, the closure of certain underperforming Restaurants, and relief from certain advertising and royalty fees under the Franchise Agreements.

39.     These negotiations and discussions continued in the weeks preceding the Petition Date and are ongoing.

## PART II
## DEBTOR'S OBJECTIVES IN THESE CHAPTER 11 CASES

40.     The principal objective of this Chapter 11 Case is to maximize the value of the Debtor's business for the benefit of all stakeholders, whether through a reorganization that restores the enterprise to sustainable profitability or through a value-maximizing sale process. The Debtor's

restaurant portfolio includes locations that generate positive cash flow alongside a subset of underperforming locations whose unit economics no longer support continued operation. The fundamental objective of this case is to streamline the enterprise by closing and exiting unprofitable locations, rationalizing the Debtor's lease portfolio and cost structure, and emerging with a smaller, healthier, and self-sustaining operating footprint.

41.     The Debtor also seeks to continue to provide employment to its employees and to provide an enterprise which will be a trading partner to many of its contract counter-parties and vendors, and of course to maximize the value of the enterprise for its creditors.

42.     The Court's approval of the relief requested in the First Day Filings will permit the Debtor to preserve and maximize its enterprise value during the Chapter 11 Case for the benefit of its employees, creditors, vendors, and other parties in interest. The Debtor's immediate objective is to stabilize its operations, continue to operate, preserve liquidity, minimize any adverse effects that this Chapter 11 Case might otherwise have on its estate by obtaining the relief requested in the First Day Filings.

43.     For these reasons, and the additional reasons discussed in the First Day Filings which are incorporated herein by reference, I respectfully submit that the various relief requested in the First Day Filings is in the best interest of the Debtor and its estate and should be approved by this Court.

**PART III**
**FACTS SUPPORTING RELIEF SOUGHT IN FIRST DAY FILINGS**

44.     Concurrently with the filing of this Chapter 11 Case, the Debtor is filing certain First Day Filings. The Debtor respectfully requests that the Court conduct a hearing as soon as practicable after the commencement of the Chapter 11 Case (the "First Day Hearing") to consider the First Day Filings. For the avoidance of doubt, the Debtor seeks authority, but not direction, to

pay amounts or satisfy obligations with respect to the relief requested in those of the First Day

Filings for which such authority is sought. The First Day Filings include the following:[3]

a. Debtor's Emergency Application for Entry of an Order Authorizing the Retention of Gulf Atlantic Capital Corporation to Provide, on an Interim and Final Basis and Effective as of the Petition Date, the Services of G. Michael Verdisco, as Chief Restructuring Officer, and Additional Personnel for the Debtor (the "CRO Retention Application").

b. Debtor's Emergency Motion for Interim and Final Orders (I) Authorizing the Debtor to Obtain Post-Petition Financing, Granting of Senior Post-Petition Security Interests and Allowance of Superpriority Administrative Expense Status Pursuant to Sections 364(c) and 364(d) of the Bankruptcy Code, (II) Authorizing Post-Petition Use of Cash Collateral, (III) Approving DIP Term Sheet, (IV) Granting Adequate Protections, (V) Modifying the Automatic Stay, and (VI) Granting Related Relief (the "DIP Motion").

c. Debtor's Emergency Motion for an Order (I) Authorizing Debtor to Pay Certain Prepetition Employee Obligations and Prepetition Withholding Obligations, (II) Authorizing the Debtor to Maintain Employee Benefit Programs, (III) Authorizing Banks to Honor Related Prepetition Transfers, and (IV) Granting Related Relief (the "Employee Wages Motion").

d. Debtor's Emergency Motion for an Order Authorizing the Debtor to (I) Continue Administering Insurance Policies; and (II) Satisfy Other Obligations Related Thereto in the Ordinary Course of Business (the "Insurance Motion").

e. Debtor's Emergency Motion for an Order (I) Authorizing Payment of Certain Taxes and Fees and (II) Granting Related Relief (the "Taxes Motion").

f. Debtor's Emergency Motion for Entry of an Order Authorizing (I) Payment of Prepetition Claims of Critical Vendors; (II) Payment of Prepetition Claims Arising Under the Perishable Agricultural Commodities Act and the Packers and Stockyards Act, Including Continuing to Provide Certain Vendors Authority to Access Disbursement Account Under Current Procedures Regarding Payment of Invoices; (III) Debtor to Enter into Vendor Agreements; and (IV) Financial Institutions to Honor and Process Related Checks and Transfers (the "Critical Vendor-PACA/PASA Motion").

g. Debtor's Emergency Motion for Entry of Interim and Final Orders (A) Authorizing the Debtor to Continue to (I) Maintain its Cash Management System, (II) Honor Certain Prepetition and Post-Petition Obligations Related Thereto, and (III) Use Existing Business Forms, and (B) Granting Related Relief (the "Cash Management Motion").

---

[3] Any defined terms used but not defined in this section shall have the meaning ascribed to them in the respective First Day Filing.

h. Debtor's Emergency Omnibus Motion to Reject Certain Unexpired Non-Residential Real Property Leases, Effective as of the Petition Date (the "Rejection Motion").

i. Debtor's Emergency Application for Entry of an Order Authorizing the Debtor to Employ and Retain Kroll Restructuring Administration LLC as Noticing, Claims and Solicitation Agent, Effective as of the Petition Date (the "Kroll Retention Application").

45. I have reviewed each of the First Day Filings (including, but not limited to, the exhibits, amendments, schedules and proposed orders attached thereto) and, to the best of my knowledge, I believe that the facts set forth therein are true and correct. Moreover, I believe that the relief sought in each of the First Day Filings: (a) is essential to enable the Debtor to enter into, and to sustain operations in, chapter 11 with minimal disruption to operations or loss of productivity or value; (b) constitutes a critical element in achieving a successful reorganization of the Debtor, or an asset sale to maximize the value of the Debtor's estate; and (c) is in the best interests of the Debtor's estate and creditors' and stakeholders' interests. Further, it is my belief that the relief sought in the First Day Filings is narrowly tailored and necessary to achieve the goals of this Chapter 11 Case, including the ability of the Debtor to preserve and to maximize value of, as well as to avoid immediate and irreparable harm to, the Debtor's estate. The facts set forth in each First Day Filing are incorporated herein by reference.[4]

46. I have consulted with the Debtor's advisors regarding the relief requested in the First Day Filings. To the best of my knowledge and belief, the factual statements contained in each of the First Day Filings are true and accurate, and each such factual statement is incorporated herein by reference.

---

[4] On or shortly after the Petition Date, the Debtor also has filed, or will file, the *Debtor's Application for Approval of the Employment of Jordi Guso and the Law Firm of Berger Singerman LLP as Counsel to the Debtor, Effective as of the Petition Date* (the "BSLLP Retention Application"). The BSLLP Retention Application will not be scheduled to be considered by the Court at the first-day hearing in this Chapter 11 Case. For the very same reasons expressed in support of the First Day Filings, I believe the Court should approve the BSLLP Retention Application when it is considered for approval by the Court.

47.	I believe that the failure to grant the relief requested in any of the First Day Filings may result in immediate and irreparable harm to the Debtor, its business, and its estate. Accordingly, for the reasons set forth herein and in each respective First Day Filing, I respectfully request that the Court grant the relief requested in each of the First Day Filings.

**PART IV**
**CONCLUSION**

48.	For the reasons described herein and in the First Day Filings which are incorporated herein by reference, I believe that the prospect for achieving the Debtor's objectives for its Chapter 11 Case and the preservation of its enterprise for the benefit of its stakeholders will be substantially enhanced if the Court grants the relief requested in each of the First Day Filings.

**28 U.S.C. § 1746 Declaration**

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my information, knowledge, and belief.

Executed this 4th day of August, 2026.

*/s/ G. Michael Verdisco*
G. Michael Verdisco
Chief Restructuring Officer